DOCKETED
DEC 1 - 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
NOV 19 2004
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | ) | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 03 C 4774 |
| | ) | |
| OBERWEIS DAIRY, | ) | Judge Darrah |
| | ) | Magistrate Levin |
| Defendant. | ) | |

## NOTICE OF MOTION

To: H. Candace Gorman
Catherine Caporusso
Gorman & Caporusso
Suite 1060
542 South Dearborn Street
Chicago, Illinois 60605

Gregory X. Gorman
Gorman & Gorman
Suite 1060
542 South Dearborn Street
Chicago, IL 60605

PLEASE TAKE NOTICE that on Tuesday, November 30, 2004 at 9:00 a.m., we shall appear before Honorable John W. Darrah, United States District Court for the Northern District of Illinois, Eastern Division, 219 South Dearborn Street, Room 1203, Chicago, Illinois, and then and there present **MOTION FOR CLARIFICATION**, a copy of which is served upon you.

Respectfully submitted,

OBERWEIS DAIRY, INC.

By: _____
One of its Attorneys

Anthony J. Crement
Franczek Sullivan P.C.
Suite 3400
300 South Wacker Drive
Chicago, Illinois 60606
(312) 786-6140

255645.1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
NOV 19 2004
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| JANE DOE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 03 C 4774 |
| ) | |
| OBERWEIS DAIRY, ) | Judge Darrah |
| ) | Magistrate Levin |
| Defendant. ) | |

## MOTION FOR CLARIFICATION

Now comes the Defendant Oberweis Dairy, Inc., by its counsel, Franczek Sullivan P.C., and asks this Court for a clarification of its Order entered on November 9, 2004 relating to the proposed testimony submitted by the Plaintiff regarding alleged emotional damages.

On August 30, 2004 this Court denied Plaintiff's Motion for Clarification and/or Reconsideration of an Order granting Defendant's Motion to Compel Psychiatric Records. In the Court's Order however, the Court instructed the Plaintiff to submit a specific statement of the proposed testimony of the Plaintiff on the issue of her pain and suffering and in turn instructed the Defendant to respond regarding the issue of the production of records.

The Plaintiff submitted a document identified as a Statement of Proposed Testimony on September 17, 2004. The Defendant responded to the Statement of Proposed Testimony (Plaintiff's statement was not in testimonial form but rather in prose form) on October 5, 2004. In its response Defendant indicated that it would not pursue the psychiatric records in this matter if one, the Plaintiff dropped any claim for emotional damages in this case or in the alternative, Plaintiff's testimony was limited in the fashion set forth in the Defendant's response. Defendant argued that the Plaintiff's purported Statement of Proposed Testimony went well beyond the reasoning contained in Santelli v. Electro-Motive, 188 Frd. 306, 309 (Northern District Illinois

255645.1

1999) which it appeared the Court was using for guidance. In particular the Court in <u>Santelli</u> stated that "a party cannot inject his or her psychological treatment, <u>conditions</u> or <u>symptoms</u> into a case and expect to be able to prevent discovery of information relevant to those issues" (emphasis added). Santelli at p. 309.

At the time the Defendant offered it's version of the Proposed Testimony on the issue of damages for pain and suffering, the Defendant was at a disadvantage since it had not had the opportunity to depose the Plaintiff in this matter. The Defendant has now taken the deposition of the Plaintiff on November 10, 2004. Defendant maintains it should not be precluded from seeking medical records and testimony from Plaintiff's psychotherapist in this matter unless the Plaintiff indicates she will not seek damages for pain and suffering. In the alternative, however, Defendant submits that if testimony is allowed relating to pain and suffering that the testimony be "limited to the negative emotions that she experienced as the intrinsic result of defendant's alleged conduct, [and] she has been barred from introducing evidence of any resulting symptoms or conditions that she might have suffered." <u>Santelli</u> at 309 cited by this Court in its Order dated November 9, 2004. In addition Defendant contends that Plaintiff's testimony should additionally be limited to the testimony actually given by the Plaintiff on this issue at her deposition rather than the formulation of testimony set forth by Plaintiff's counsel in the Proposed Statement of Testimony. We are attaching a copy of the transcript pages from the deposition of the Plaintiff wherein she speaks of the effect on her of the conduct she alleges occurred between she and Mr. Nayman. It is Defendant's contention that starting with Plaintiff's own testimony and removing testimony of symptoms and conditions[*] Plaintiff is left with testifying:

---

[*] The Santelli decision precluded the plaintiff from offering "evidence through any witness about symptoms or conditions that she suffered (e.g., sleeplessness, nervousness, depression)…"

>I was embarrassed by it because I didn't want people to find out if, you know, - - I didn't want them to think of me any different, and it just was something now I try hard not to think of because it was upsetting.

(Tr. p. 141)

and

>When I had worked with him, I felt uncomfortable because he had not said anything about it and it just seemed like - - It was really hurtful to know that someone could have intercourse with someone so young and not be able to talk to them about it after, and it was emotional for me being my first time.
>
>It was not something that was I would say a good experience.

(Tr. p. 142.)

Respectfully submitted,

OBERWEIS DAIRY, INC.

By: _____
One of its Attorneys

Anthony J. Crement
Franczek Sullivan P.C.
300 South Wacker Drive
Suite 3400
Chicago, Illinois 60606
(312) 786-6140

3

255645.1

```
 1    those four times?
 2        A    I wouldn't say it happened every time,
 3    but three out of four.
 4        Q    And what kind of a hug was it?  The
 5    sideways hug you described?
 6        A    No, it was a hug.
 7        Q    And were you offended by it?
 8        A    I felt it awkward.
 9        Q    Why did you go back?
10        A    Because I wanted to  -- I wanted to get
11    to know my co-workers better and they would always
12    talk about it, so I felt left out.
13        Q    And you think you were hugged maybe three
14    times at Mr. Nayman's apartment by Mr. Nayman?
15        A    Yes.
16        Q    Would you be able to reconstruct which
17    times it was that he hugged you of the four times
18    you were there?
19        A    No. Some of them were like as I would
20    leave, he would give me a hug good-bye.
21        Q    And did you find that offensive?
22        A    I just thought of it as a good-bye hug.
23        Q    Okay.  What impact did any of your
24    contact with Mr. Nayman have upon you personally?
```

1   A   On myself?  How was I feeling?
2   Q   Yes.
3   A   I felt used.  I was afraid to start
4   dating new people, I was afraid to find a new job,
5   I felt that after it happened I was left out and
6   hurt and it affected just my friends.
7       Most of all I just felt like he used me
8   and didn't -- I just -- I was embarrassed by it
9   because I didn't want people to find out if, you
10  know, -- I didn't want them to think of me any
11  different, and it just was something now I try
12  hard not to think of because it was upsetting.
13  Q   As far as finding a new boyfriend, you
14  started going out with Mr. O'Connor a couple
15  months later, didn't you, towards the end of '02?
16  A   It was three or four months after, yes.
17  Q   And you began working at the sports store
18  fairly quickly also, didn't you?
19  A   I believe it was a little bit after, yes.
20  Q   Okay.
21  A   But I was comfortable in that situation
22  because they were my neighbors and I knew them
23  well.
24  Q   Did this have any other impact on you

1    than what you've described?

2    A   My school work had gone down. I had a
3    rough beginning of the year, my junior year.

4    Q   What were your grades in freshman and
5    sophomore year?

6    A   Mostly B's. Some C's, but rarely.

7    Q   And what were your grades in junior year?

8    A   Barely B's, C's, and I even had a D at
9    one point.

10    Q   Any other impact on you?

11    A   It was just something that made me
12    uncomfortable even when we were working.

13    Q   When you were working --

14    A   When I had worked with him, I felt
15    uncomfortable because he had not said anything
16    about it and it just seemed like -- It was really
17    hurtful to know that someone could have
18    intercourse with someone so young and not be able
19    to talk to them about it after, and it was
20    emotional for me being my first time.

21    It was not something that was I would say
22    a good experience.

23    Q   You were concerned -- Strike that.

24    Anything else, Miss Doe?

1    A    Not that I can think of.

2    Q    This was previously marked as Defendant's
3    Exhibit 1. I'm going to ask you if you would share
4    that with Counsel first and tell me if you
5    recognize that.

6        Have you seen that before, Miss Doe?

7    A    I don't remember. I don't know if I
8    have.

9    Q    Do you recall talking to your mother or
10    your father about Mr. McCarthy's request to find
11    out what happened so that the company could
12    investigate this matter?

13    A    No.

14    Q    So you don't recall either your mother or
15    your father or anyone else asking whether you
16    wanted to be involved in such an investigation?

17    A    I don't remember.

18    Q    Okay. This is Defendant's 2.

19        Do you recognize that document?

20    A    Yes.

21    Q    Okay. And you had seen this at about the
22    time of it's date, February 11, 2003?

23    A    I believe so, yes.

24    Q    And did you know that the EEOC was trying

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he caused a copy of the foregoing **MOTION FOR CLARIFICATION** to be served upon the following counsel of record by mail delivery on this 19th day of November, 2004:

>H. Candace Gorman
>Catherine Caporusso
>Gorman & Caporusso
>Suite 1060
>542 South Dearborn Street
>Chicago, Illinois 60605

>Gregory X. Gorman
>Gorman & Gorman
>Suite 1060
>542 South Dearborn Street
>Chicago, Illinois 60605

_____
Anthony J. Crement

255645.1